CORTINAS, J.
 

 Reynaldo Garcia (“Garcia”) and Juan Carlos Chavez (“Chavez”) opened Rey/Chavez Distributor Corporation (“Distributor 1”) in 2004. Garcia and Chavez were each issued 50 shares of stock. Between January and July 2005, Alberto Du-menigo (“Dumenigo”) purchased 20 shares of Distributor 1 stock for a total of $75,000. Although Garcia and Chavez each transferred 10 shares of their stock to Dumeni-go, the bank checks used by Dumenigo for the purchase were made payable to Distributor 1. The parties memorialized the transaction in a stock purchase agreement. Dumenigo asserts that after he purchased the stock, he began working full-time for Distributor 1. Later that same year, the parties executed another stock purchase agreement whereby Chavez transferred 10 shares of his stock to Dumenigo in exchange for a payment of $40,000 to Distributor 1.
 

 Due to the level of success enjoyed by Distributor 1, the parties decided to expand their distribution business to an additional store location. A second entity, Rey/Chavez Distributor No. 2 (“Distributor 2”) began operating shortly thereafter and met with success equal to that of Distributor 1 (Distributor 1 and Distributor 2 are collectively the “Distributor Entities”). In conjunction with the operation of the Distributor Entities, Garcia, Chavez, and Dumenigo each received weekly salaries and payment of their automobile leases from Distributor 1 as compensation for their work.
 

 
 *1087
 
 In late 2009, Dumenigo was purportedly told by Garcia, Chavez, and counsel for the Distributor Entities that he was going to be bought out. When the parties were unable to agree upon a buy-out price, in early 2010, Dumenigo was relieved of any employment obligations for the Distributor Entities.
 
 [1]
 
 Near in time to Dumenigo’s release from employment, Distributor 1 issued a payment in the amount of $87,500 to Garcia and Distributor 2 issued a payment in the amount of $87,500 to Chavez.
 
 [2]
 
 According to Garcia and Chavez, the $37,500 sums were repayment for an accounting error brought about by the fact that when Dumenigo purchased his original shares, they were transferred from Garcia and Chavez individually, but Du-menigo’s payments were made to Distributor 1.
 

 Dumenigo later made an offer to be bought out, and after it was rejected by Garcia and Chavez, he filed the underlying suit. Along with his lawsuit, Dumenigo filed a motion for temporary injunctive relief. Following a hearing on the motion for injunctive relief, the trial court enjoined Garcia and Chavez “to cause [Distributor 1] to issue a distribution to [Du-menigo] in the amount of $37,500” by a date certain.
 
 [3]
 
 Garcia and Chavez now argue that the trial court improperly granted the injunction. We agree and reverse.
 

 “[A] preliminary injunction is an extraordinary remedy which should be granted sparingly....”
 
 City of Jacksonville v. Naegele Outdoor Adver. Co.,
 
 634 So.2d 750, 752 (Fla. 1st DCA 1994) (quoting
 
 Thompson v. Planning Comm’n,
 
 464 So.2d 1231, 1236 (Fla. 1st DCA 1985)). It is axiomatic that “the purpose of a temporary injunction is to preserve the status quo pending the final hearing....”
 
 Sacred Family Invs., Inc. v. Doral Supermarket, Inc.,
 
 20 So.3d 412, 417 (Fla. 3d DCA 2009). Moreover, “[t]he status quo preserved by a temporary injunction is the last peaceable noncontested condition that preceded the controversy.”
 
 Bailey v. Christo,
 
 453 So.2d 1134, 1137 (Fla. 1st DCA 1984) (citing
 
 Bowling v. Nat’l Convoy & Trucking Co.,
 
 101 Fla. 634, 135 So. 541 (1931)) (emphasis added). In the case before us, the purported shareholder distribution to Garcia and Chavez is, in actuality, part of the “controversy” between the parties. Count I of Dumenigo’s complaint specifically alleges:
 

 Garcia and Chavez have breached their fiduciary duty to Mr. Dumenigo by, among other things, causing the [Distributor Entities] to terminate Mr. Du-menigo’s employment and cut off his compensation, on which Mr. Dumenigo reasonably relied as a return on his significant investment; causing the [Distributor Entities] to issue to themselves, but not to Mr. Dumenigo, payments superficially described as “repayments of initial investments” (but which are, in essence, disguised dividend payments) while simultaneously causing the [Distributor Entities] to refuse to pay Mr. Dumenigo the pro rata amount to which he is entitled....
 

 (emphasis added). Whether the $37,500 payments to Garcia and Chavez constitute
 
 *1088
 
 actual shareholder distributions or mere repayments to correct an accounting error and consequently, whether Dumenigo is himself entitled to such payment are questions that go to the merits of the underlying lawsuit.
 
 See City of Jacksonville,
 
 634 So.2d at 754. Furthermore, although Dumenigo argues that the status quo preserved by the injunction is the equal treatment of the shareholders prior to the controversy, no evidence of any prior distributions was presented. By enjoining Garcia and Chavez to effectuate a distribution to Dumenigo, the trial court clearly abused its discretion by going well beyond the preservation of the status quo.
 
 See Sacred Family,
 
 20 So.3d at 417 (reversing, upon confession of error, a portion of an injunction requiring a landlord to convert a construction site back to usable parking spaces because doing so was beyond preservation of the status quo.) Accordingly, we reverse the order on appeal to the extent it requires Garcia and Chavez to make a $37,500 distribution to Du-menigo through Distributor 1. We need not reach the other points on appeal.
 

 Reversed and remanded.
 

 [1]
 

 . While the parties all agree that Dumenigo was relieved of his employment obligations at the Distributor entities, there is no evidence of an actual employment agreement between Dumenigo and the Distributor Entities.
 

 [2]
 

 . Dumenigo alleges that he was told by Garcia and Chavez that they would each receive an additional $37,500 in June 2010.
 

 [3]
 

 .The trial court made an oral ruling at an emergency hearing on June 1, 2009 and later entered a written order, nunc pro tunc, on June 21, 2009.